UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOMINICAN SISTERS OF HAWTHORNE, and SERVANTS OF RELIEF FOR INCURABLE CANCER dba ROSARY HILL HOME<br><br>*Plaintiffs,*<br><br>v.<br><br>KATHY HOCHUL, in her official capacity as Governor of the State of New York;<br><br>JAMES V. McDONALD, in his official capacity as Commissioner of the New York State Department of Health;<br><br>KRISTEN M. PERGOLINO, in her official capacity as Director of the<br>Division of Residential Support<br>Center for Residential Surveillance<br>Office of Aging and Long-Term Care of the New York State Department of Health;<br><br>KELLY ANN ANDERSON, in her official capacity as Director of the Division of Adult Care Facility and Assisted Living Surveillance of the New York State Department of Health; and<br><br>STEPHANIE E. PATON, in her official capacity as Director of the Division of Nursing home and ICF/IID Surveillance of the New York State Department of Health,<br><br>*Defendants.* | Case No. _____<br><br>**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     For 125 years, the Dominican Sisters of Hawthorne, Congregation of St. Rose of Lima ("Sisters" or "Dominican Sisters of Hawthorne") have cared for the dying poor. Founded in 1900 by Rose Hawthorne Lathrop, daughter of Nathaniel Hawthorne, the Sisters' apostolate is the Servants of Relief for Incurable Cancer, doing business as Rosary Hill Home. Rosary Hill Home is a 42-bed skilled nursing facility in Hawthorne, New York, that provides palliative care and

comfort to cancer patients with financial need in their final days. The Sisters and Rosary Hill Home accept no payment for their services, relying instead on their own labor and charitable donations to fulfill their mission: "We cannot cure our patients, but we can assure the dignity and value of their final days and keep them comfortable and free of pain."



2.      Now, however, the State of New York threatens to shut down the ministry of the Dominican Sisters of Hawthorne and Rosary Hill Home unless they violate their Catholic faith.

3.       New York's LGBTQ Long-Term Care Facility Residents' Bill of Rights, codified at New York Public Health Law § 2803-c-2 and amplified by a series of Dear Administrator Letters and a State-prepared training materials, require long-term care facilities to assign patients to rooms based on stated "gender identity" rather than biological sex even over the opposition of the room-mate, to permit residents and their visitors of one sex to access bathrooms set aside for those of the opposite sex, to use patients' "preferred pronouns" even when the patient is not present, to use

2

language and to "create communities" affirming patients' sexual preferences, to accommodate patients' desire for extramarital relations, and to post notices affirming compliance with these requirements. Long-term care facilities are also required to ensure their staff undergo "cultural competency" training indoctrinating them in these practices and in gender ideology. The statute and its implementation by the State to require these and related practices are collectively called the "Mandate."

4. The Mandate exempts facilities operated by the Church of Christ, Scientist but provides no exemption for Catholic or other religious organizations. If the Dominican Sisters of Hawthorne and Rosary Hill Home do not comply, they face fines, injunctions, potential loss of licensing, and imprisonment.

5. Plaintiffs Dominican Sisters of Hawthorne and Rosary Hill Home bring this action against the Mandate, which violates the First and Fourteenth Amendments to the United States Constitution. Plaintiffs seek declaratory and injunctive relief.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

7. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district.

8. The Rosary Hill Home, operated by the Dominican Sisters of Hawthorne, is located at 600 Linda Avenue, Hawthorne, New York, which is within Westchester County and the White Plains Division of the Southern District of New York.

## PARTIES

***Plaintiffs Dominican Sisters of Hawthorne and Servants of Relief for Incurable Cancer dba Rosary Hill Home***

9.      Plaintiff the Dominican Sisters, Congregation of St. Rose of Lima is a congregation of Dominican sisters with its motherhouse in Hawthorne, New York.  It is, under the canon law of the Catholic Church, a religious institute and public juridic person.  It is, under the civil law of the State of New York, an unincorporated non-profit association.

10.      Plaintiff the Servants of Relief for Incurable Cancer is a New York charitable, not-for-profit corporation that performs its ministry as Rosary Hill Home.

11.      Rose Hawthorne Lathrop, the daughter of Nathaniel Hawthorne, who took the name Mother Mary Alphonsa, founded the order in 1900.

12.      The Servants of Relief for Incurable Cancer filed its certificate of incorporation dated April 7, 1899, with the New York Secretary of State on February 7, 1901.  It was approved for incorporation by the New York State Board of Charities on January 24, 1901.  It filed its certificate of type of not-for-profit corporation designating itself as a New York not-for-profit corporation on April 1, 1972.

13.      The *New York Times Magazine* profiled the incredible work of the Dominican Sisters of Hawthorne in May 2016. *See* Brooke Jarvis, *The Sisters Who Treat the Untreatable*, N.Y. Times Mag., May 12, 2016, https://www.nytimes.com/2016/05/15/magazine/the-sisters-who-treat-the-untreatable.html.

14.      The Dominican Sisters of Hawthorne opened the Rosary Hill Home in 1901. It is located at 600 Linda Avenue, Hawthorne, New York, Westchester County. Mother Alphonsa stated the Sisters' mission: "We cannot cure our patients, but we can assure the dignity and value of their final days and keep them comfortable and free of pain." They do this by providing extraordinarily personal, familial, home-like care (https://rosaryhillhome.org/our-mission). The Sisters

state that they "dedicate [their] lives to fulfilling the goal of Mother Alphonsa: 'We must make our guests glad they crossed the threshold that is to be their last boundary. We must make them as comfortable and happy as if their own people had kept them and put them into the very best bedroom.'"

15.    Rosary Hill Home is a 42-bed skilled nursing facility that offers palliative care and comfort to indigent cancer patients in their last days through the work of around twenty Dominican sisters along with employees and contractors of Rosary Hill Home.





16.    It provides this care at no charge and without government or insurance funding.





17.     Rosary Hill Home has employees licensed or certified by the State of New York, nine of whom are members of the Dominican Sisters of Hawthorne.

18.     Rosary Hill Home also retains certified nurse aide agency employees as independent clinical contractors.

19.     All employees and clinical contractors at Rosary Hill affirm the truth of Catholic Church teachings and pledge to conduct themselves consistently with the teachings of the Church and the values of the Sisters.

20.     Among other things, Rosary Hill Home operates single-sex facilities when appropriate. For example, Rosary Hill Home will only room its patients in single-sex rooms. Male patients must room with male patients, and female patients must room with female patients.

21.     Rosary Hill Home also separates the floors of its facilities by sex, alternating men and women's floors.

22.     Rosary Hill Home's bathrooms are segregated by biological sex.

23.     According to the New York State Department of Health website, https://profiles.health.ny.gov/nursing_home/view/150634#inspections, for the four-year reporting period

from February 1, 2022 through January 31, 2026, the Department has received with regard to Rosary Hill Home zero complaints, and the Department has issued zero citations against it. The Rosary Hill Home has been subject to zero enforcement actions in the last five years.

24.     This is in contrast to a typical nursing home. Over the same time period, New York has received more than 55,000 complaints against other nursing homes and has issued an average of 23 citations to each nursing home in the state.

*Defendants*

25.     Defendant Kathy Hochul is the Governor of the State of New York. She is sued in her official capacity. The Governor is responsible for the execution and enforcement of the laws of the State of New York, including New York Public Health Law § 2803-c-2.

26.     Defendant James V. McDonald is the Commissioner of the New York State Department of Health. He is sued in his official capacity. The Commissioner is responsible for the administration and enforcement of New York's public health laws, including the Mandate.

27.     Defendants Kristen Pergolino, Kelly Ann Anderson, and Stephanie E. Paton, holding offices as identified in the caption of this complaint, are the authors of the Dear Administrator Letters described herein. *See* Exs. A, B, and C. They each have responsibility, individually and collectively, for enforcing the Mandate.

28.     Defendants were responsible for issuing the "Dear Administrator Letters" attached as Exhibits A, B, and C, informing long-term care facilities of their obligations under the Mandate.

## PLAINTIFFS' BELIEFS AND PRACTICES

29.     The Dominican Sisters of Hawthorne and Rosary Hill Home are Catholic ministries that believe and practice the teachings of the Catholic Church on the nature of the human person, the dignity of humankind, the right to life, the right of conscience and religious freedom, and related ethical issues.

8

30.     The Catholic Church teaches that all people are created in the image and likeness of God and are thus imbued with human dignity. All persons are therefore to be loved and respected in their human freedom, even if they reject the Church's teaching on matters of sexual identity and sexual morality.

31.     The Catholic Church consistently affirms the inherent dignity of each and every human person and advocates for the wellbeing of all people, particularly the most vulnerable. People who struggle with their gender identity deserve compassion, sensitivity, and respect.

32.     The Dominican Sisters of Hawthorne and Rosary Hill Home operate in accordance with the Ethical and Religious Directives and the teachings of the Catholic Church. They cannot comply with the Mandate without violating these sincerely held religious beliefs. USCCB, *Ethical and Religious Directives for Catholic Health Care Services* (7th ed., November 2025) ("ERDs").

33.     This Complaint is verified by Mother Marie Edward, O.P., Superior of the Dominican Sisters of Hawthorne and President of Servants of Relief for Incurable Cancer.

34.     The Dominican Sisters of Hawthorne and Rosary Hill Home are directly regulated by the Mandate and have suffered, and will continue to suffer, concrete harm from Defendants' enforcement of the Mandate. They thus have standing to sue in their own right.

### *Catholic teaching on care for the poor and terminally ill*

35.     Catholic social teaching holds that "a basic moral test is how our most vulnerable members are faring." USCCB, *Seven Themes of Catholic Social Teaching: Option for the Poor and Vulnerable*, https://www.usccb.org/beliefs-and-teachings/what-we-believe/catholic-social-teaching/seven-themes-of-catholic-social-teaching.  Jesus Christ directly commanded his followers to care for the sick and the poor, stating that human beings' eternal destiny will be determined by "whatever you did for one of these least brothers of mine." *Matthew* 25:37-40. The Dominican Sisters of Hawthorne adhere to this teaching and directly carry out Jesus' command by caring for some of the most vulnerable members of society: the elderly poor facing terminal cancer.

36.     Catholic teaching on care for the terminally ill emphasizes the sacred dignity of each person until his or her final breath. Catholics are called to accompany the dying through this sacred journey, fostering hope and providing authentic presence rather than abandoning those whose cures are beyond medicine's reach. USCCB, *Hope for the Journey: Meaningful Support for the Terminally Ill*, https://www.usccb.org/committees/pro-life-activities/hope-journey-meaning-ful-support-terminally-ill.

37.     The Dominican Sisters of Hawthorne and Rosary Hill Home embody these Catholic teachings through their ministry. Their mission was established long before mainstream medicine embraced end of life palliative care. Mother Alphonsa declared: "We cannot cure our patients, but we can assure the dignity and value of their final days and keep them comfortable and free of pain."

38.     The Dominican Sisters of Hawthorne and Rosary Hill Home put the Church's pref-erential option for the poor into concrete practice by accepting no payment from the families of those they treat, all of whom are indigent cancer patients facing terminal illness. The Sisters and Rosary Hill Home care for those of all religions and backgrounds, seeing in each patient the face of Christ.

39.     The Dominican Sisters of Hawthorne and Rosary Hill Home manifest respect for each patient's dignity through numerous, tender, and very personal acts of care such as painting women's fingernails, combing their hair, changing them into fresh nightgowns, and arranging flowers in their rooms.

40.     The Dominican Sisters of Hawthorne's and Rosary Hill Home's ministry to the elderly poor who are terminally ill represents an integral expression of Catholic faith, combining the Church's preferential option for the poor with its commands to tend the sick and to acknowledge the dignity of human life from conception to natural death. Any governmental man-date that interferes with this religious ministry strikes at the heart of Catholic beliefs and practices.

*Catholic teaching on human sexuality*

41.    Plaintiffs' beliefs and practices about care for the sick, elderly poor are inseparable from their respect for human beings' sexual identities. Both arise from Scripture and follow from the "greatest" "commandment" to "love the Lord, your God" and to "love your neighbor as yourself." *Matthew* 22:37-39.

42.    Jesus Christ directly affirmed the Book of Genesis' teaching that God made human beings "male and female," in his image, and declared this to be "good" (*Genesis* 1:27-31; *Matthew* 19:4-6), part of God's loving plan for humanity.

43.    Understanding and accepting human beings as created male or female is therefore also crucial for understanding and communicating the nature of God and his love for us. The Bible uses the image of a man and a woman in marriage to help humans understand both of these. In the Old Testament, God refers to himself as the faithful bridegroom. In the New Testament, Jesus also refers to himself as the bridegroom and instructs that men and women are to love him as a bride loves her husband, and to love one another as He loved them. *John* 13:34. Denying the givenness of male and female, and the family based upon this reciprocal relationship of opposite sexes, thus obscures a central image of God and the command of love at the heart of Christianity. It also destroys the anthropological basis for the family, society's source of life, health, stability and progress.

44.    Reason naturally affirms faith on this matter, because God is the author of all reason and creation. Sex is inscribed into every cell in the human body. "Transgender medicine" can change surface appearance but never sex. And Scripture forbids lying to another about reality. Catechism of the Catholic Church ("CCC") ¶ 2483 (2d ed. 2019).

45.    Requiring a person to identify another by a sex other than his or her God-gifted sex would therefore require such a person to act against central, unchangeable and architectural teachings of the Catholic faith. It would contradict the teachings of the Bible concerning God's creative

sovereignty, contradict reason and truth, and betray our sacred obligation not to knowingly harm other persons, particularly the most vulnerable. The implications are so much greater than whether to utter the words "he" or "she." Indeed, to demand that a Catholic deny another's sex is to require him or her to affirm another religious worldview.

46.     The Church teaches that it is never morally permissible to deny, suppress, or attempt to change one's God-given biological sex through psychological, social, hormonal, or surgical interventions.

47.     Catholic teaching affirms that each person's soul is made for the body it inhabits and thus it is never in the "wrong body." In addition, the body is not a mere "thing" to be manipulated by mind or will, like other things in the world. It is, rather, sacred. CCC ¶ 364; USCCB, Committee on Doctrine, *Doctrinal Note on the Moral Limits to Technological Manipulation of the Human Body* 4 (2023).

48.     Lying about a person's sex, including through use of false pronouns, names, or other methods of "social transitioning," harms vulnerable human beings in many other ways. Lying about sex often serves to confirm a vulnerable person's psychological dysphoria and may interfere with that person's healthy growth and identity formation. Using false pronouns confounds the psychological process by which people grow to understand themselves, including the distinctions inherent between persons of the opposite sex. Requiring someone to mis-identify another, including by a false pronoun, knowingly obstructs the other person's development. *See* Congregation for Catholic Education, *"Male and Female He Created Them" Towards a Path of Dialogue on the Question of Gender Theory in Education*, ¶¶ 26, 33, 35 (2019).

49.     The Church has recently reemphasized its rejection of "gender theory," the set of ideas and practices that undergird New York's Mandate. *See* Dicastery for the Doctrine of the Faith, *Dignitas Infinita* ¶ 56 (2024) ("Pope Francis has reminded us that 'the path to peace calls

for respect for human rights . . . Regrettably, in recent decades, attempts have been made to introduce new rights that are neither fully consistent with those originally defined nor always acceptable. They have led to instances of ideological colonization, in which gender theory plays a central role; the latter is extremely dangerous since it cancels differences in its claim to make everyone equal.'") (quoting Pope Francis, *Address to Members of the Diplomatic Corps Accredited to the Holy See for the Presentation of New Year's Greetings* (2024)). "Desiring a personal self-determination, as gender theory prescribes, apart from this fundamental truth that human life is a gift, amounts to a concession to the age-old temptation to make oneself God, entering into competition with the true God of love revealed to us in the Gospel." *Id.* ¶ 57. "This ideology 'envisages a society without sexual differences, thereby eliminating the anthropological basis of the family.'" *Id.* ¶ 59 (quoting Pope Francis, Apostolic Exhortation *Amoris Laetitia*, no. 56 (2016)). "[But] '[w]e cannot separate the masculine and the feminine from God's work of creation, which is prior to all our decisions and experiences, and where biological elements exist which are impossible to ignore.'" *Id.* (quoting Pope Francis, Apostolic Exhortation *Amoris Laetitia*, no. 286 (2016)). "Only by acknowledging and accepting this difference in reciprocity can each person fully discover themselves, their dignity, and their identity." *Id.*

50.    Requiring a Catholic institution to admit persons of one sex into a space reserved for the opposite sex violates the Catholic theological commitment to modesty—the preservation of respect for the dignity of the person. CCC ¶¶ 2521-24. In many circumstances, such a requirement would also undercut Plaintiffs' concern for an environment safe from embarrassment or misconduct.

### THE NEW YORK MANDATE

51.    On March 18, 2024, the Dominican Sisters of Hawthorne and Rosary Hill Home received the first of three "Dear Administrator Letters" from officials acting on behalf of the New York Department of Health alerting the Sisters to their purported obligations under New York's

LGBTQ Long-Term Care Facility Residents' Bill of Rights, found in New York Public Health Law § 2803-c-2. They received another letter on October 2, 2024, and a third on January 16, 2025. Each informs them of their legal obligation to comply with the requirements of Section 2803-c-2. Accurate copies of the letters are attached as Exhibits A, B, and C.

52.     New York Public Health Law § 2803-c-2 applies to "long-term care facilities" ("LTCFs") and their staff. LTCF means "residential health care[,] . . . adult care facilities[,] . . . and assisted living residences . . . or any facilities which hold themselves out or advertise themselves as providing assisted living services and which are required to be licensed or certified under" New York Law. N.Y. Pub. Health Law §§ 2803-c-2(1)(b), 2801(2), and 2801(3).

53.     Rosary Hill Home is a long-term care facility as defined in New York Public Health Law § 2803-c-2.

54.     LTCF "staff" includes "all individuals employed by or contracted directly with the facility." This term is not limited to staff that are licensed. *Id.* § 2803-c-2(1)(c). "Staff" includes both employees and independent clinical contractors. *See generally id.*

***The Mandate compels speech and conduct contrary to Catholic values and teaching***

55.     Section 2803-c-2 prohibits discrimination by a "long-term care facility or facility staff . . . against any resident on the basis of such resident's actual or perceived sexual orientation, gender identity or expression, or human immunodeficiency virus (HIV) status." *Id.* § 2803-c-2(2)(a).

56.     The statute enumerates a list of eight actions constituting unlawful discrimination. It is discrimination for an LTCF or its staff to:

a.     "deny admission to a long-term care facility, transfer or refuse to transfer a resident within a facility or to another facility, or discharge or evict a resident from a facility";

b.     "deny a request by residents to share a room";

14

c.    "where rooms are assigned by gender, assigning, reassigning or refusing to assign a room to a transgender resident other than in accordance with the transgender resident's gender identity, unless at the transgender resident's request";

d.    "prohibit a resident from using, or harass a resident who seeks to use or does use, a restroom available to other persons of the same gender identity, regardless of whether the resident has taken or is taking hormones, has had transition-related surgery, or is making a gender transition or appears to be gender-nonconforming";

e.    "willfully and repeatedly fail to use a resident's preferred name or pronouns after being clearly informed of the preferred name or pronouns, even if the resident is not present";

f.    "deny a resident the right to wear or be dressed in clothing, accessories, or cosmetics that are permitted for any other resident";

g.    "restrict a resident's right to associate with other residents or with visitors, including the right to consensual expression of intimacy or sexual relations, unless the restriction is uniformly applied to all residents in a nondiscriminatory manner"; or

h.    "deny or restrict a resident from accessing appropriate medical or nonmedical care, or provide medical or nonmedical care, that unreasonably demeans the resident's dignity or causes avoidable discomfort."

*Id.*

57.    The Mandate thus prohibits Rosary Hill Home and its staff from assigning patients to rooms by biological sex, prohibits segregating restrooms by biological sex, requires the use of patients' preferred pronouns even when the patient is not present, and requires allowing patients to cross-dress.

***The Mandate Requires "Cultural Competency" Training Contrary to Catholic Values and Beliefs.***

58.    The Mandate states, "every two years, [an] [LTCF] shall ensure that every facility staff member who works directly with residents receives training on cultural competency focusing on residents who identify as lesbian, gay, bisexual or transgender and residents living with HIV." *Id.* § 2803-c-2(7)(a).

59.    This training is developed by the New York Department of Health and must be given to new employees within six months of their hiring and to all employees every two years.

60.    The State's training materials are ideological in nature and are aimed at educating workers on what the State believes to be "affirming" care for LGBTQIA+ people. The training instructs that by the end of the training, employees will be able to "[c]reate communities welcoming to residents with diverse sexual orientations and gender identities or expressions" and "[d]emonstrate knowledge of best practices in providing affirming care to residents with diverse sexual orientations and gender identities or expression."

61.    The training materials emphasize the importance of using preferred pronouns and instruct that transgender people must be allowed to use whatever restroom they wish even if it makes others uncomfortable.

62.    They also emphasize that a facility should make homosexual patients feel comfortable being "romantic with each other" and provide "support and acceptance about [patients'] sexual health."

63.    The State requires certified nurse aides to be trained at the time of their certifications and recertifications. The State also indirectly imposes such a duty upon all staff members interacting with patients by making it unlawful for LTCFs to hire untrained staff.

*The Mandate's Posting Requirement Compels False Speech.*

64.     The Mandate requires every LTCF to post a public notice stating:

(NAME OF FACILITY) DOES NOT DISCRIMINATE AND DOES NOT PER-MIT DISCRIMINATION, INCLUDING, BUT NOT LIMITED TO, BULLYING, ABUSE, HARASSMENT, OR DIFFERENTIAL TREATMENT ON THE BASIS OF ACTUAL OR PERCEIVED SEXUAL ORIENTATION, GENDER IDEN-TITY OR EXPRESSION, OR HIV STATUS, OR BASED ON ASSOCIATION WITH ANOTHER INDIVIDUAL ON ACCOUNT OF THAT INDIVIDUAL'S ACTUAL OR PERCEIVED SEXUAL ORIENTATION, GENDER IDENTITY OR EXPRESSION, OR HIV STATUS. YOU MAY FILE A COMPLAINT WITH THE OFFICE OF THE NEW YORK STATE LONG-TERM CARE OMBUDS-MAN PROGRAM (PROVIDE CONTACT INFORMATION) IF YOU BELIEVE THAT YOU HAVE EXPERIENCED THIS KIND OF DISCRIMINATION.

N.Y. Pub. Health Law § 2803-c-2(3).

65.     In the context of the Mandate, "discrimination" includes things like requiring patients to use the bathroom associated with their biological sex or referring to a person using pronouns matching their biological sex.

66.     Thus, the notice requires the Dominican Sisters of Hawthorne and Rosary Hill Home to publicly affirm that they will use patients' preferred pronouns, let them use the restroom of their choice, and house men with women upon request.

*The Mandate Requires Record Keeping Contrary to Catholic Values and Teaching.*

67.     Each LTCF must keep records, "generated at the time of admission" regarding the patient's "gender identity, correct name, as indicated by the resident, and pronoun of each resident, as indicated by the resident." *Id.* § 2803-c-2(4)(a).

*The Mandate Exempts Christian Scientists But Not Catholic Organizations.*

68.     While the Mandate includes no general religious organization exemption, it does include a religious exemption narrowly tailored to protect the Church of Christ, Scientist and its affiliates. The exemption states: "The provisions of this article shall not apply to a facility or institution engaged principally in providing services by or under the supervision of the bona fide members and adherents of a recognized religious organization whose teachings include reliance on

17

spiritual means through prayer alone for healing in the practice of the religion of such organization and where services are provided in accordance with those teachings." N.Y. Pub. Health Law § 2801(1).

69.    This exception shields LTCFs operated by the Church of Christ, Scientist from the requirements of Section 2803-c-2. The Mandate provides no exemption for Catholic facilities or staff members.

***Plaintiffs Face Severe Enforcement Consequences.***

70.    If the Dominican Sisters of Hawthorne and Rosary Hill Home do not comply with the Mandate, they will face fines, court orders, potential loss of licensing, and jail time. This applies both to the facility and its employees.

71.    The Dominican Sisters of Hawthorne and Rosary Hill Home currently engage in the religious practices that the Mandate prohibits: housing patients in single-sex rooms, using pronouns consistent with biological sex, and declining to post the required notice.

72.    They are presently subject to enforcement under the Mandate, have received three formal Dear Administrator Letters demanding compliance, and face imminent fines and license revocation if they continue their current religious practices. They have not complied and do not intend to comply. Their injury is therefore immediate.

73.    Under N.Y. Pub. Health Law § 12, any person who violates the public health law is subject to a penalty not to exceed $2,000 for each violation. N.Y. Pub. Health Law § 12. This penalty increases to $5,000 per violation on repeat offenses. *Id.* Section 12 also authorizes the Commissioner of Health to seek an injunction against any person who violates any section of the public health law. *Id.*

74.    Willful violation of the public health laws is punishable by up to one year in prison, a fine of up to $10,000, or both. N.Y. Pub. Health Law § 12-b. A willful violation is a knowing one; there is no element of evil motive required.

18

75.     Failure to comply with State law is professional misconduct for all medical professionals in New York, including nurses. Violation of § 2803-c-2 would constitute grounds for revocation of any professional license.

76.     On March 5, 2026, the Dominican Sisters of Hawthorne and Rosary Hill Home submitted a written request to Defendants for an exemption from the Mandate. They requested a response by March 20, 2026. As of the date this Complaint was filed, they have received no response from Defendants.

**CLAIMS FOR RELIEF**
**COUNT I: 42 U.S.C. § 1983 - FREE EXERCISE**

77.     Plaintiffs incorporate by reference all preceding paragraphs.

78.     The Free Exercise Clause provides that a law burdening religious exercise must satisfy strict scrutiny unless it is "neutral [and] generally applicable." *Employment Div., Dep't of Human Resources of Ore. v. Smith*, 494 U.S. 872, 880 (1990).

79.     The Mandate is not neutral because it discriminates between religious groups by exempting Christian Science LTCFs and their employees while denying any exemption to Catholic organizations. *See Catholic Charities Bureau, Inc. v. Wisconsin Labor & Indus. Review Comm'n*, 605 U.S. 238, 248-49 (2025).

80.     The Mandate is not generally applicable because it exempts Christian Science LTCFs from its requirements.

81.     Indeed, on March 5, 2026, Plaintiffs wrote to Defendants requesting an exemption from the Mandate. Defendants have refused to even respond to the Plaintiffs' written request.

82.     The Free Exercise Clause absolutely prohibits governmental regulation of religious beliefs and governmental compulsion to affirm beliefs contrary to religious beliefs. *Smith*, 494 U.S. at 877. The Mandate requires religious LTCFs to indoctrinate their staff in an ideology that

functions as an extended critique of Catholic values, and to speak and act in accordance with that critique.

83.    The Mandate burdens hybrid rights, including rights related to the free exercise of religion, freedom of speech, and freedom of expressive association. *See id.* at 881.

84.    The Mandate fails strict scrutiny. Defendants cannot demonstrate a compelling governmental interest in forcing Plaintiffs to associate with individuals indoctrinated in ideology contrary to their religious beliefs, nor that the Mandate is the least restrictive means of achieving any such interest.

85.    The Mandate violates the Free Exercise Clause.

## COUNT II:  42 U.S.C. § 1983 - RELIGIOUS AUTONOMY DOCTRINE

86.    Plaintiffs incorporate by reference all preceding paragraphs.

87.    The First Amendment Doctrine of Religious Autonomy protects religious institutions from governmental regulation of their internal religious affairs. This doctrine, grounded in the Religion Clauses of the First Amendment, protects a religious institution's autonomy with respect to:

a.    "internal discipline and government," *Serbian E. Orthodox Diocese for United States and Canada v. Milivojevich*, 426 U.S. 696, 724 (1976), to matters of "faith and doctrine," *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (internal quotation marks and citation omitted);

b.    "internal management decisions that are essential to [its] central mission," *id.*; and

c.    any internal policy or leadership decision adopted for religious reasons, *Union Gospel Mission of Yakima, Wash. v. Brown*, 162 F.4th 1190, 1208 (9th Cir. 2026); *Bryce v. Episcopal Church in the Diocese of Colorado,* 289 F.3d 648, 655 (10th Cir. 2002).

88.    The Supreme Court has held that religious institutions are entitled to make decisions concerning their internal affairs free from government interference. "In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all." *Watson v. Jones*, 80 U.S. 679, 728 (1872). "The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." *Id.*

89.    The Mandate interferes with Plaintiffs' religious autonomy by requiring Plaintiffs to adopt policies, to undergo and act consistently with training, to post notices, and to use speech that contradicts their sincerely held religious beliefs and the teachings of the Catholic Church. The religious subject matters affected by the Mandate include the manner in which Plaintiffs perform the healing ministry of Christ, the ability of Plaintiffs to align their actions with the ERDs and other Catholic values, and the right of Plaintiffs to communicate consistently with Catholic values.

90.    The Mandate inserts its requirements into the marrow of Plaintiffs' religious mission. For example, Dominican religious like the Sisters are also called the "Order of Preachers," and the Dominican Sisters of Hawthorne declare that their "preach[ing]" mission is carried out through "our ministry to [God's] sick poor." But the Mandate intrudes upon this personal, bodily religious ministry, elements of which include the Sisters' creating welcoming bedrooms for each patient, caring for their bathroom needs, dressing them and even grooming their hair and nails.

91.    The Mandate violates the First Amendment's protection of religious autonomy.

### COUNT III: 42 U.S.C. § 1983 - MINISTERIAL EXCEPTION

92.    Plaintiffs incorporate by reference all preceding paragraphs.

93.    The First Amendment Ministerial Exception is an offspring of the Religious Autonomy principle. *See Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 188 (2012); *Our Lady of Guadalupe Sch.*, 591 U.S. at 746-47. The ministerial exception has

been applied in many contexts including long-term care and medical settings. *See Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000); *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 309-10 (4th Cir. 2004).

94.    The Ministerial Exception recognizes that the relationship between a religious society and its ministers is a core ecclesiastical subject matter.

95.    The chief component of the healing ministry of Christ carried out directly by the Sisters and their staff, is personal care of the bodies and souls of their patients. All of the clinical employees of the Rosary Hill Home are ministers, each of whom has declared her or his commitment to Catholic teachings.

96.    The Mandate's requiring all who carry out this ministry to be indoctrinated in an ideology at odds with foundational Catholic beliefs related to human sexuality—that treats practices aligned with Catholic values as unlawful "discrimination," and imposes training requirements and speech codes directly contradicting Catholic values—fundamentally alters and corrupts the healing ministry of Christ carried out by Plaintiffs, including the Dominican Sisters of Hawthorne and the Rosary Hill Home.

97.    The Mandate violates the First Amendment Ministerial Exception.

### COUNT IV: 42 U.S.C. § 1983 - ESTABLISHMENT CLAUSE

98.    Plaintiffs incorporate by reference all preceding paragraphs.

99.    The Establishment Clause prohibits government preference or discrimination between different religions. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

100.    The Mandate violates the Establishment Clause by favoring the Church of Christ, Scientist with an exemption while denying it to other religious groups, including Catholic organizations.

101. The Mandate fails strict scrutiny. Defendants cannot demonstrate a compelling governmental interest in forcing Plaintiffs to comply with the Mandate, while allowing the Church of Christ, Scientist an exemption. A State that exempts Christian Science facilities relying on prayer alone cannot plausibly claim a compelling interest in forcing Catholic facilities to comply.

### COUNT V: 42 U.S.C. § 1983 - EQUAL PROTECTION

102. Plaintiffs incorporate by reference all preceding paragraphs.

103. The Equal Protection Clause forbids religious discrimination unless it is narrowly tailored to serve a compelling governmental interest. *See Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1266 (10th Cir. 2008).

104. The Mandate discriminates between religious groups by exempting the Church of Christ, Scientist and its affiliates while denying any exemption to Catholic organizations.

105. The Mandate fails strict scrutiny. This discrimination is not narrowly tailored to serve a compelling governmental interest. Defendants cannot demonstrate a compelling governmental interest in enforcing the Mandate against Plaintiffs, the Dominican Sisters of Hawthorne and Rosary Hill Home. Nor is the Mandate the least restrictive means of achieving any such interest. Defendants have numerous alternative means available to them, including providing long-term care facilities themselves consistent with the Mandate.

106. The Mandate violates the Equal Protection Clause.

### COUNT VI: 42 U.S.C. § 1983 - FREE SPEECH

107. Plaintiffs incorporate by reference all preceding paragraphs.

108. Freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Compelling a person to speak a message with which they disagree is generally unconstitutional, *see Janus v. AFSCME*, 585 U.S.

878, 892 (2018), and laws that compel speech are generally subject to strict scrutiny, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988).

109. The Mandate compels speech in at least three ways.

110. First, the Mandate compels Plaintiffs to post a disclosure in their facilities stating, among other things, that they do not treat people differently based on gender identity or permit others to do so.

111. Second, the Mandate compels Plaintiffs to provide or enforce trainings containing statements with which they disagree, including statements about the importance of using preferred pronouns, encouraging same-sex relationships, and affirming gender transitions.

112. Third, the Mandate compels Plaintiffs and their staff to use patients' preferred names and pronouns even when they are not in the presence of those patients. This is both compelled speech and a restriction on speech because New York is compelling the use of some pronouns and forbidding the use of others.

113. The Mandate fails strict scrutiny. Defendants cannot demonstrate a compelling governmental interest in compelling the Dominican Sisters of Hawthorne and Rosary Hill Home to speak messages contrary to their religious beliefs, nor that the Mandate is the least restrictive means of achieving any such interest.

114. The Mandate violates the Free Speech Clause.

### COUNT VII: 42 U.S.C. § 1983 - EXPRESSIVE ASSOCIATION

115. Plaintiffs incorporate by reference all preceding paragraphs.

116. Under the First Amendment, "the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed." *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298, 309 (2012). When a group "engage[s] in some form of expression" and a law "affects in a significant way the group's ability to advocate public or private

viewpoints," the law can stand only if it passes strict scrutiny. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).

117. "[R]eligious groups are the archetype of associations formed for expressive purposes," and the right of expressive association "applies with special force with respect to religious groups, whose very existence is dedicated to the collective expression and propagation of shared religious ideals." *Hosanna-Tabor*, 565 U.S. at 200 (Alito & Kagan, JJ., concurring).

118. The Mandate requires Plaintiffs to ensure that all staff who work directly with residents receive biennial training in gender ideology masquerading as cultural competency, compelling Plaintiffs to indoctrinate its workforce in a belief system fundamentally at odds with Catholic teaching.

119. This significantly harms Plaintiffs' ability to associate with like-minded individuals who share their religious beliefs and to advocate their religious viewpoints.

120. The Mandate fails strict scrutiny. Defendants cannot demonstrate a compelling governmental interest in forcing Plaintiffs to associate with individuals indoctrinated in ideology contrary to their religious beliefs, nor that the Mandate is the least restrictive means of achieving any such interest.

121. The Mandate violates the right of expressive association.

## CONCLUSION

122. Across seven independent constitutional grounds, New York's Mandate demands that the Dominican Sisters of Hawthorne abandon their religious beliefs or abandon their 125-year mission of mercy to the dying poor. The Constitution permits neither. This Court should declare the Mandate unconstitutional as applied to Plaintiffs and permanently enjoin its enforcement against Plaintiffs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Declare that the Mandate violates the First and Fourteenth Amendments to the United States Constitution as applied to Plaintiffs, the Dominican Sisters of Hawthorne and Rosary Hill Home, and their respective agents, employees, and clinical contractors;

B.      Preliminarily and permanently enjoin Defendants from enforcing the Mandate against Plaintiffs, the Dominican Sisters of Hawthorne and Rosary Hill Home, and their respective agents, employees, and clinical contractors;

C.      Award Plaintiffs the costs of this action and reasonable attorney's fees as provided by law, including 42 U.S.C. § 1988(b); and

D.      Award such other and further relief as the Court deems equitable and just.

DATED: April 6, 2026

Respectfully submitted,

/s/ Lincoln Davis Wilson
Lincoln Davis Wilson
First & Fourteenth PLLC
784 S. Clearwater Loop # 8011
Post Falls, ID 83854
(719) 234-0938
lincoln@first-fourteenth.com

Andrew Nussbaum*
L. Martin Nussbaum*
Erin Gust*
First & Fourteenth PLLC
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903
(719) 428-2386
andrew@first-fourteenth.com
martin@first-fourteenth.com
erin@first-fourteenth.com

Attorneys for Plaintiff
*Applications for pro hac vice admission forthcoming

**VERIFICATION OF MOTHER MARIE EDWARD, O.P.**

I, Mother Marie Edward, O.P., declare under penalty of perjury as follows:

1.    I am the Superior of the Dominican Sisters, Congregation of St. Rose of Lima, and President of Servants of Relief for Incurable Cancer dba Rosary Hill Home.  I am authorized to make this verification on behalf of the Dominican Sisters of Hawthorne and Rosary Hill Home.

2.    I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief. The factual statements in the Verified Complaint, including the statements concerning the Dominican Sisters of Hawthorne, Rosary Hill Home, our mission, operations, employees, clinical contractors, our Catholic doctrine, beliefs, and practices, and the impact of New York's LGBTQ Long-Term Care Facility Residents' Bill of Rights on the Dominican Sisters of Hawthorne and Rosary Hill Home, are true and correct to the best of my knowledge, information, and belief.

3.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 31, 2026, at Hawthorne, New York.


Mother Marie Edward, O.P.
Superior, Dominican Sisters of Hawthorne
President, Servants of Relief for Incurable Cancer