## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DOMINICAN SISTERS OF HAWTHORNE, and
SERVANTS OF RELIEF FOR INCURABLE
CANCER d/b/a ROSARY HILL HOME,

        *Plaintiffs*,

and

UNITED STATES OF AMERICA,

        *Plaintiff-Intervenor*,

        v.

KATHY HOCHUL, in her official capacity as
Governor of the State of New York;

JAMES V. McDONALD, in his official capacity
as Commissioner of the New York State Department of
Health;

KRISTEN M. PERGOLINO, in her official capacity as
Director of the Division of Residential Support Center for
Residential Surveillance Office of Aging and Long-Term
Care of the New York State Department of Health;

KELLY ANN ANDERSON, in her official capacity as
Director of the Division of Adult Care Facility and Assisted
Living Surveillance of the New York State Department of
Health; and

STEPHANIE E. PATON, in her official capacity as Director
of the Division of Nursing home and ICF/IID Surveillance
of the New York State Department of Health,

        *Defendants*.

Case No.:
26-cv-02809-NSR-VR

**COMPLAINT
IN INTERVENTION FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

The bedrock of this American legal system is the freedom of religious exercise. It is the right of all Americans to practice according to their own beliefs without government infringement or discrimination. Four separate constitutional provisions make clear that "[a]bsent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits."[1] Because Defendants enforce New York law that imposes different requirements and burdens on operators of long-term care facilities depending on such operators' religious beliefs, and because these regulations cannot survive strict scrutiny, the United States of America brings this action and alleges:

## INTRODUCTION

1. Distinctions on the basis of religion are constitutionally suspect. *See Friedman v. Rogers*, 440 U.S. 1, 17 (1979); *Cabrera v. Att'y Gen. United States*, 921 F.3d 401, 404 (3d Cir. 2019) ("Classifications involving 'fundamental personal rights' or 'suspect distinctions such as race, religion, or alienage' are subject to heightened scrutiny.") (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)).

2. Under the Fourteenth Amendment, it is unlawful for state actors to differentiate between citizens based on their religion absent a compelling state interest—and even then, using only the narrowest means to achieve that interest. *See, e.g.*, *Bowman v. United States*, 564 F.3d 765, 772 (6th Cir. 2008) ("Strict scrutiny applies where the classification affecting eligibility for benefits is based on religion or burdens the exercise of religion."). *See also Cooper v. Swern*, 2025 WL 81398, at *5 (S.D.N.Y. Jan. 12, 2025) (same).

---

[1] *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring).

3.      Despite the constitutional mandate "that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class," *Students for Fair Admissions v. Harvard Coll., et al.*, 600 U.S. 181, 223 (2023) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)), the statutes of the State of New York governing long-term care facilities treats such facilities and their operators differently based on the religious practices and beliefs of such operators.

4.      This disparate treatment on the basis of religion violates the Equal Protection Clause of the Fourteenth Amendment.  *See Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 715 (1994) (O'Connor, J., concurring).

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343 because this case involves claims under a provision of the U.S. Constitution, and because the United States can intervene, as of right, in any action "seeking relief from the denial of equal protection of the laws under the [F]ourteenth [A]mendment to the Constitution on account of race, color, religion, sex or national origin."  42 U.S.C. § 2000h-2.

6.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

7.      The Rosary Hill Home, operated by the Dominican Sisters-The Servants of Relief for Incurable Cancer, is located at 600 Linda Avenue, Hawthorne, New York, which is within the Northern Counties in this district.

8.      Because this case is of general public importance, as certified by the Attorney General of the United States, *see* Ex. A, Plaintiff United States of America respectfully invokes its right under 42 U.S.C. § 2000h-2 to intervene in this matter.

**PARTIES**

9.    Plaintiff-Intervenor United States of America ("United States") brings this action under 42 U.S.C. § 2000h-2.

10.    Plaintiff the Dominican Sisters, Congregation of St. Rose of Lima is a congregation of Dominican sisters with its motherhouse in Hawthorne, New York.  It is, under the canon law of the Catholic Church, a religious institute and public juridic person.  It is, under the civil law of the State of New York, an unincorporated non-profit association.

11.    Plaintiff the Servants of Relief for Incurable Cancer is a New York charitable, not-for-profit corporation that performs its ministry as Rosary Hill Home.

12.    Rosary Hill Home is a skilled nursing facility that offers palliative care and comfort to indigent cancer patients in their last days through the work of around twenty Dominican sisters along with employees and contractors of Rosary Hill Home.

13.    Defendant Kathy Hochul is the Governor of the State of New York.  She is sued in her official capacity.  The Governor is responsible for the execution and enforcement of the laws of the State of New York, including New York Public Health Law § 2803-c-2 ("the Mandate").

14.    Defendant James V. McDonald is the Commissioner of the New York State Department of Health.  He is sued in his official capacity.  The Commissioner is responsible for the administration and enforcement of New York's public health laws, including the Mandate.

15.    Defendants Kristen Pergolino, Kelly Ann Anderson, and Stephanie E. Paton, holding offices as identified in the caption of this complaint, are the authors of the Dear Administrator Letters sent to the Plaintiffs.  *See* ECF 1, Exs. A, B, and C.  They are each sued in

4

their official capacities.  They each have responsibility, individually and collectively, for enforcing the Mandate.[2]

<strong>FACTS</strong>

16.    Plaintiff Dominican Sisters of Hawthorne is a Catholic religious order which operates Rosary Hill Home, a long-term care facility as defined in New York Public Health Law § 2803-c-2.

17.    Rosary Hill Home has employees licensed or certified by the State of New York, nine of whom are members of the Dominican Sisters of Hawthorne.

18.    Rosary Hill Home also retains certified nurse aide agency employees as independent clinical contractors.

19.    All employees and clinical contractors at Rosary Hill Home affirm the truth of Catholic Church teachings and pledge to conduct themselves consistently with the teachings of the Church and the values of the Sisters.

20.    Consistent with their religious beliefs and the doctrine of the Catholic Church regarding "preferential option for the poor," ECF 1, ¶38, and "the sacred dignity of each person until his or her final breath," *id.*, ¶36, the Dominican sisters provide palliative care for patients suffering from terminal cancer.

21.    The care provided by the Dominican sisters includes appropriate nursing care, as well as "very personal acts of care such as painting women's fingernails, combing their hair, changing them into fresh nightgowns, and arranging flowers in their rooms." *Id.*, ¶39.

---

[2] Because all Defendants are New York State public officials and are being sued in their official capacities, they will be referred to collectively as "State of New York," or simply "New York."

22.     Both the medical and personal care provided "represent[] an integral expression of Catholic faith, combining the Church's preferential option for the poor with its commands to tend the sick and to acknowledge the dignity of human life from conception to natural death." *Id.*, ¶40.

23.     In operating the Rosary Hill Home, Dominican sisters also follow the Catholic Church's teaching and doctrine on human sexuality. *Id.*, ¶41-50.

24.     According to the Dominican sisters, "[t]he Church teaches that it is never morally permissible to deny, suppress, or attempt to change one's God-given biological sex through psychological, social, hormonal, or surgical interventions." *Id.*, ¶46.  Additionally, the Dominican sisters believe that to "identify another by a sex other than his or her God-gifted sex" involves not only "contradict[ing] the teachings of the Bible concerning God's creative sovereignty," *id.*, ¶45, but also "[l]ying about [that] person's sex," which in itself is religiously prohibited, *id.*, ¶48.[3]

25.     Dominican sisters operate the Rosary Hill Home consistent with the above-described religious beliefs.  Thus, "Rosary Hill Home will only room its patients in single-sex rooms.  Male patients must room with male patients, and female patients must room with female patients." *Id.*, ¶20.  The bathrooms in the facility are also separated by sex. *Id.*, ¶22. Consistent with their understanding of the Catholic doctrine, Dominican sisters refer to all patients by pronouns reflecting patients' biological sex. *See id.*, ¶48.

26.     New York Public Health Law regulates the licensure and activities of, *inter alia*, healthcare facilities. *See generally* N.Y. Pub. Health L. Art. 28.

---

[3] The United States does not and cannot inquire into details of the Catholic Church's doctrine or into whether the Dominican sisters properly understand the Church's teachings. *See Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.").  It is sufficient that these beliefs are sincerely held. *See, e.g., Holt v. Hobbs*, 574 U.S. 352, 361 (2015).

27.     Section 2803-c-2, effective as of May 28, 2024, creates a "bill of rights" for "lesbian, gay, bisexual and transgender, and people living with HIV long-term care facility residents[]." *Id.* § 2803-c-2.

28.     "Long-term care facilities" are defined to include "a nursing home or a facility providing health-related service." *Id.* § 2801(3) (cross-referenced in *Id.* § 2803-c-2(1)(b)).

29.     The Mandate makes it unlawful to "to discriminate against any resident on the basis of such resident's actual or perceived sexual orientation, gender identity or expression." *Id.* § 2803-c-2(2)(a).

30.     The Mandate defines the following acts as discriminatory and therefore unlawful:

a.  [A]ssigning, reassigning or refusing to assign a room to a transgender resident other than in accordance with the transgender resident's gender identity, unless at the transgender resident's request;

b.  [P]rohibit[ing] a resident from using, or harass a resident who seeks to use or does use, a restroom available to other persons of the same gender identity, regardless of whether the resident has taken or is taking hormones, has had transition-related surgery, or is making a gender transition or appears to be gender-nonconforming;

c.  [W]illfully and repeatedly fail[ing] to use a resident's preferred name or pronouns after being clearly informed of the preferred name or pronouns, even if the resident is not present; and

d.  [R]estrict[ing] a resident's right to … consensual expression of intimacy or sexual relations, unless the restriction is uniformly applied to all residents in a nondiscriminatory manner.

31.    The statute further mandates biennial "cultural competency" training "focusing on residents who identify as lesbian, gay, bisexual or transgender and residents living with HIV." *Id.* § 2803-c-2(7)(a).

32.    Because this training is developed by the New York Department of Health, *see id.*, it is unsurprising that the training reflects New York State's policy on issues related to "sexual orientation and gender identity," that are in tension with the Dominican sisters' beliefs on "human sexuality and gender theory."

33.    As a result, in practice, this training requires that individual healthcare providers affirm that they subscribe to state policies that violate their sincerely held religious beliefs.

34.    Pursuant to the Mandate, each long-term care facility is required to post notices that it "does not discriminate and does not permit discrimination, including, but not limited to, bullying, abuse, harassment, or differential treatment on the basis of actual or perceived sexual orientation, gender identity or expression . . . or based on association with another individual on account of that individual's actual or perceived sexual orientation, gender identity or expression . . .." *Id.* § 2803-c-2(3).

35.    Each facility must also adopt internal recordkeeping procedures carrying into effect the Mandate's demands.

36.    New York Public Health Law makes the Mandate (as well as other requirements) inapplicable "to a facility or institution engaged principally in providing services by or under the supervision of the bona fide members and adherents of a recognized religious organization whose teachings include reliance on spiritual means through prayer alone . . .." N.Y. Pub. Health L. § 2801(1).

37.    Accordingly, nursing care facilities such as High Ridge House, a non-profit corporation under the laws of the State of New York, which is a member of the Association of Organizations for Christian Science Nursing, Inc., would not be bound by the Mandate because High Ridge House relies completely on Christian Science for healing.

38.    In contrast, facilities that rely on medical *and* spiritual means of care, including at Rosary Hill Home, are covered by the Mandate.

39.    Furthermore, § 2803-c-2(2)(b) allows facilities to disregard the Mandate's requirements "to the extent that they are incompatible with any professionally reasonable clinical judgment that is based on articulable facts of clinical significance."  But no similar exemption is available on account of ethical or religious judgments.

## CAUSES OF ACTION

### Count 1: Unlawful Discrimination on the Basis of Religion in Violation of U.S. Const. Amend. XIV, § 1

40.    The United States realleges and incorporates by reference all of the preceding paragraphs of the Complaint as if fully stated herein.

41.    The Fourteenth Amendment to the United States Constitution prohibits discrimination on the basis of religion save for those rare and compelling circumstances that can survive the daunting review of strict scrutiny.  *See Friedman*, 440 U.S. at 17; *Bowman*, 564 F.3d at 772.

42.    The State of New York is subject to the limits imposed by the Equal Protection Clause of the Fourteenth Amendment.

43.    The Mandate is facially discriminatory because New York subjects practitioners of different religions to different regulatory regimes.

9

44.     Under New York law, religious institutions that rely solely on prayer as a method of care are not required to follow the "lesbian, gay, bisexual and transgender, and people living with HIV long-term care facility residents' bill of rights," *see* N.Y. Pub. Health L. § 2801(1), whereas religious institutions that rely on both prayer and modern medical interventions are fully required to comply with the Mandate.

45.     The exemption granted to "prayer only" providers is granted solely on the basis of those providers' religious beliefs, which reject administering chemical drugs, conducting surgeries, or other modern medical interventions.  In contrast, religious individuals whose beliefs require them to minister to the sick through both prayer and modern medical interventions are not provided with a similar exemption.

46.     Refusing to treat similarly situated religious groups similarly violates the Equal Protection Clause of the Fourteenth Amendment.

47.     The Mandate is also facially discriminatory because New York treats religious objections to the Mandate less deferentially than secular objections.

48.     Under New York law, long-term care facilities are permitted to ignore any and all requirements of the "bill of rights" "to the extent that they are incompatible with any professionally reasonable clinical judgment that is based on articulable facts of clinical significance."  *See* N.Y. Pub. Health L. § 2803-c-2(2)(b).  Thus, under New York law, a long-term care facility can refuse to house a "trans-identifying" patient with a person of opposite sex if the facility were to make a secular clinical judgment that such housing may cause clinically significant mental disturbance to the roommate.  However, a long-term care facility may not deny opposite-sex housing to the "trans-identifying" individual were it to conclude that such housing would cause spiritual harm to the putative roommate.

10

49.     New York's asserted interest of combating, "discrimination by staff [], discrimination by other residents [], [and] isolation from other residents . . .," S. 1783A (N.Y. 2023) is not rationally served by the religious distinction that the statute draws, because the mere fact that a particular long-term care institution does or does not provide modern medical care is not germane to whether the "trans-identifying" individuals in these facilities face discrimination by staff or other residents.

50.     For the same reason, the presence of a secular exemption from the Mandate's requirements and the lack of a corresponding religious exemption from those same requirements is not rationally related to New York's stated interests because any harm to the "trans-identifying" individuals is the same in either circumstance.  Yet, the State foregoes whatever interest it has in alleviating this harm when it is countervailed by "clinical"—but not by "spiritual"—harm to another.  *A fortiori*, New York cannot meet the requirements of strict scrutiny.

51.     Thus, the Mandate fails "the minimum requirement of neutrality" to religion. *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533 (1993).

52.     The Mandate further violates the Equal Protection Clause because it interferes with the Dominican Sisters' exercise of their fundamental rights, *viz.*, freedom of religion.  *Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009) (A "typical equal protection challenge is based on denial of a fundamental right.  Fundamental rights include freedom of speech and religion.") (internal citations omitted).

53.     Because the Mandate interferes with the Dominican Sisters' freedom to exercise their religion, it is subject to strict scrutiny.  *See Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) ("[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right . . .

11

."). Because there are no reasons to grant exemptions from the Mandate on the basis of certain religious or secular beliefs, but not other religious beliefs, the Mandate necessarily fails the strict scrutiny analysis.

54. The Attorney General has determined this case to be of general public importance, thus justifying the intervention by the United States. *See* 42 U.S.C. § 2000h-2.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that this Court enter judgment against all Defendants and grant the following relief:

a. A declaratory judgment that New York Public Health Law § 2803-c-2 violates the Fourteenth Amendments to the U.S. Constitution as applied to Plaintiffs;

b. A preliminary and permanent injunction prohibiting all Defendants, their successors, and other persons who are in active concert or participation with them, from enforcing the provisions of New York Public Health Law § 2803-c-2 against Plaintiffs.

c. An award of all such other additional relief as the interests of justice may require.

DATED: June 22, 2026     Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

JESUS A. OSETE
Principal Deputy Assistant Attorney General

R. JONAS GEISSLER
Deputy Assistant Attorney General

*s/ Gregory Dolin*
GREGORY DOLIN (NYRN 4326294)
Senior Counsel
KELSEY E. MCGEE (MO No. 74929)
JANE E. ANDERSEN (NYRN 4651519)
DAVID K. GARDNER (MN No. 0402104)
Trial Attorneys

Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 598-9251
Email: gregory.dolin@usdoj.gov

ATTORNEYS FOR PLAINTIFF-INTERVENOR
UNITED STATES OF AMERICA