**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DOMINICAN SISTERS OF HAWTHORNE; SERVANTS OF RELIEF FOR INCURABLE CANCER dba ROSARY HILL HOME; MISSIONARY SISTERS OF ST. BENEDICT, INC.; and MISSIONARY SISTERS OF ST. BENEDICT HOME FOR THE AGED, INC. dba ST. JOSEPH'S HOME FOR THE AGED

*Plaintiffs*,

v.

KATHY HOCHUL, in her official capacity as Governor of the State of New York;

LETITIA JAMES, in her official capacity as Attorney General of the State of New York;

JAMES V. MCDONALD, in his official capacity as Commissioner of the New York State Department of Health;

KRISTEN M. PERGOLINO, in her official capacity as Director of the Division of Residential Support Center for Residential Surveillance Office of Aging and Long-Term Care of the New York State Department of Health;

KELLY ANN ANDERSON, in her official capacity as Director of the Division of Adult Care Facility and Assisted Living Surveillance of the New York State Department of Health; and

STEPHANIE E. PATON, in her official capacity as Director of the Division of Nursing Home and ICF/IID Surveillance of the New York State Department of Health,

*Defendants*.

Case No. 7:26-cv-02809-NSR

**BRIEF OF AMICI CURIAE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' VERIFIED FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

CORPORATE DISCLOSURE STATEMENT ..... vi

STATEMENT OF INTEREST ..... 1

ARGUMENT ..... 4

I. LONGSTANDING AND PERVASIVE DISCRIMINATION AGAINST LGBTQ+ OLDER ADULTS NECESSITATES THE PROTECTIONS AFFORDED BY THE RESIDENTS' BILL OF RIGHTS. ..... 5

A. A Lifetime of Discrimination Leaves LGBTQ+ Older Adults in Poor Health. ..... 5

B. LGBTQ+ Older Adults Depend Disproportionately on Formal Long-Term Care. ..... 9

C. In Long-Term Care Settings, LGBTQ+ Residents Often Face Discrimination and Neglect. ..... 11

II. NEW YORK'S RESIDENTS' BILL OF RIGHTS ADDRESSES THE BARRIERS FACED BY LGBTQ+ OLDER ADULTS AND THOSE WITH HIV IN ACCESSING LONG-TERM CARE. ..... 13

CONCLUSION ..... 14

CERTIFICATE OF COMPLIANCE ..... 16

**TABLE OF AUTHORITIES**

*Matter of Brooke S.B. v. Elizabeth A.C.C.*,
28 N.Y.3d 1 (2016) ........................................................................................1

*Cody VV. v Brandi VV.*,
226 A.D.3d 24 (3d Dep't 2024) ........................................................................2

*Lashawn K. v Admin. for Children's Services*,
221 A.D.3d 431 (1st Dep't 2023) ...................................................................... 1

*Matter of Tomeka N.H. v. Jesus R.*,
183 A.D.3d 106 (4th Dep't 2020) ...................................................................... 1

**Statutes**

Act of Nov. 30, 2023, ch. 682, 2023 N.Y. Laws 1874 ........................................ 10

N.Y. Pub. Health Law § 2803-c-2 (McKinney 2026) ...................................... 10, 12

**Other Authorities**

AARP, *Maintaining Dignity: Understanding and Responding to the Challenges Facing Older LGBT Americans* (2020), https://www.aarp.org/content/dam/aarp/research/surveys_statistics/life-leisure/2020/maintaining-dignity-lgbt-reformatted.doi.10.26419-2Fres.00217.006.pdf ........................................................................... 10, 11

Alex Montero et al., *LGBT Adults' Experiences with Discrimination and Health Care Disparities: Findings from the KFF Survey of Racism, Discrimination, and Health*, KFF (Apr. 2, 2024), https://www.kff.org/racial-equity-and-health-policy/lgbt-adults-experiences-with-discrimination-and-health-care-disparities-findings-from-the-kff-survey-of-racism-discrimination-and-health/. ...............6, 8

Anna Gordon, *LGBTQ Seniors Face Discrimination in Long-Term Care,* PBS News Hour (Oct 18, 2016), https://www.pbs.org/newshour/nation/lgbtq-seniors-face-discrimination-long-term-care. ............................................... 12

Ben R. Inventor, Olimpia Paun & Erik McIntosh, *Mental Health of LGBTQ Older Adults*, 60 J. Psychosocial Nursing & Mental Health Servs. 7 (2022), https://pubmed.ncbi.nlm.nih.gov/35353662/ .................................................. 7

Brandon C. Yarns et al., *The Mental Health of Older LGBT Adults*, 18 Current Psychiatry Reports 1 (2016), https://pubmed.ncbi.nlm.nih.gov/27142205/ ......................... 9

Carey Candrian and Kristin G. Cloyes, *"She's Dying and I Can't Say We're Married?": End-of-Life Care for LGBT Older Adults*, 61 The Gerontologist, 1197 (2021), https://academic.oup.com/gerontologist/article/61/8/1197/6030904 .................................... 4

*Glossary of Terms*, Human Rights Campaign (last updated May 31, 2023), https://www.hrc.org/resources/glossary-of-terms. .................................................................2

*Health & Healthcare*, Advoc. for Trans Equal., https://transequality.org/issues/health-healthcare (last visited Oct. 20, 2026) ....................... 7

Ingrid Handlovsky et al., *The Collective Trauma of HIV/AIDS and Contemporary Constructions of Health: Older Gay Men's Perspective*, 6 SSM - Qualitative Rsch. Health (2024), https://www.sciencedirect.com/science/article/pii/S2667321524000866#bib46 ........................................................................................................ 7

Jennifer L. Carnahan & Andrew C. Pickett, *Post-Acute Care and Long-Term Care for LGBTQ+ Older Adults*, 40 Clinical Geriatric Med. 321 (2024).................................... 9

Judith Graham, *LGBTQ+ People Relive Old Traumas as They Age on Their Own*, The Lund Report (Jan. 2, 2025), https://www.thelundreport.org/content/lgbtq-people-relive-old-traumas-they-age-their-own ............................................................... 8

Justice in Aging, *Stories from the Field: LGBT Older Adults in Long Term Care Facilities* (2024) https://lgbtagingcenter.org/wp-content/uploads/sites/6/2025/08/NSCLC_LGBT_report.pdf................................ 10, 11, 12

Justice in Aging, *Supporting LGBTQ+ Older Adults' Basic Needs* (Sept. 18, 2025), https://justiceinaging.org/supporting-lgbtq-older-adults-basic-needs/. ....................... 9

Karen Fredriksen Goldsen, *Shifting Social Context in the Lives of LGBTQ Older Adults*, 82 Pub. Pol. & Aging Rep. (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC5972452/....................................................... 6

Kevin A. McLemore, *A Minority Stress Perspective on Transgender Individuals' Experiences with Misgendering*, 3 Stigma & Health 53 (2016) ...................................... 11

Kevin A. McLemore*, Experiences with Misgendering: Identity Misclassification of Transgender Spectrum Individuals*, 14 Self & Identity 51 (2014) ............................... 11

Lauren J.A. Bouton, Amanda M. Brush & Ilan H. Meyer, *LGBT Adults Aged 50 and Older in the US During the COVID-19 Pandemic,* Williams Inst. UCLA Sch. L., (Jan. 2023), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Older-Adults-Jan-2023.pdf. ....................................................... 5

Lauren M. Porsch, Ila Dayananda & Gillian Dean, *An Exploratory Study of Transgender New Yorkers' Use of Sexual Health Services and Interest in Receiving Services at Planned Parenthood of New York City*, 1 Transgender Health 23 (2016), https://pmc.ncbi.nlm.nih.gov/articles/PMC5367479/ ............................. 7

*LGBTQ+ Survey Summary*, Stony Brook Med. https://www.stonybrookmedicine.edu/LGBTQ/2021-Survey-Summary (last visited Oct. 27, 2026)..........................................................................................6, 9

Lindsey Dawson et al., *LGBTQ+ Health Policy*, KFF (Oct. 8, 2025), https://www.kff.org/lgbtq/health-policy-101-lgbtq-health-policy/. .................................8, 9

Maingi et al., *Improving the Hospice and Palliative Care Experiences of LGBTQ Patients and Their Caregivers,* 48 Primary Care: Clinics Off. Prac., 339 (2021), https://www.sciencedirect.com/science/article/abs/pii/S0095454321000142?via%3Dihub. ........................................................................................... 11, 12

N.Y. State Dep't of Health, *New York State Department of Health Releases Report on Sexual Orientation and Gender Identity* (July 8, 2025), https://www.health.ny.gov/press/releases/2025/2025-07-08_gender_identity_report.htm.......................................................................... 5

Priya Chidambaram et al., 5 *Key Facts About Nursing Facilities and Medicaid*, KFF (May 28, 2025), https://www.kff.org/medicaid/5-key-facts-about-nursing-facilities-and-medicaid/. .........................................................................11

Rory Herbert, *The Homophobic Response to the AIDS Crisis in the 1980s*, The Gale Review (May 17, 2017), https://review.gale.com/2017/05/17/the-homophobic-aids-crisis-of-the-1980s/........................................................................ 8

SAGE & Human Rights Campaign, *Long-Term Care Equality Index 2021*, 6 (2025), https://www.sageusa.org/wp-content/uploads/2025/08/sage-lei-2021-report-final.pdf........................................................................................... 13

SAGE & Movement Advancement Project, *Understanding Issues Facing LGBTQ+ Older Adults* 10 (2025), https://www.sageusa.org/wp-content/uploads/2025/08/sageusa-understanding-issues-facing-lgbt-older-adults.pdf .......................................................................................8, 9

SAGE, AARP N.Y. & AARP Found., *Disrupting Disparities: Solutions for LGBTQ New Yorkers 50+* 2 (2021), https://www.sageusa.org/wp-content/uploads/2025/08/disrupting-disparities-lgbtq-new-yorkers-3.pdf. ..............................6

SAGE, *Facts on LGBTQ+ Aging* 1 (May 2025), https://www.sageusa.org/wp-content/uploads/2025/08/sage-facts-on-lgbtq-aging-2025.pdf.......................................... 6

Sara Luterman, *LGBTQ+ Seniors Fear Having to Go Back in Closet for the Care They Need*, Them (Oct. 12, 2021), https://www.them.us/story/lgbtq-seniors-fear-having-to-go-back-in-closet-for-the-care-they-need ............................................ 11

Soon Kyu Choi & Ilan H. Meyer, *LGBT Aging: A Review of Research Findings, Needs, and Policy Implications* Williams Inst. UCLA Sch. L., 11 (Aug. 2016), https://williamsinstitute.law.ucla.edu/wp-content/archive/LGBT-Aging-Aug-2016.pdf. ........................................................................................ 6, 7, 10, 12

TIAA Institute, *Playing the Long Game: How Longevity Affects Financial Planning and Family Caregiving* 5 (2023), https://www.tiaa.org/content/dam/tiaa/institute/pdf/insights-report/2023-10/tiaa-institute-upenn-how-longevity-affects-financial-planning-ti-november-2023.pdf. ................................................................................................ 10

**Miscellaneous**

N.Y. State Assemb., Memorandum in Support of Legis., A. 372A, 246th Leg., Reg. Sess. (2023) .................................................................................... 13

## CORPORATE DISCLOSURE STATEMENT

Advocates for Trans Equality is a nonprofit corporation. It has no parent corporation and no publicly held corporation owns more than 10% of its stock.

The Bridge (LGBTCC), Inc. d/b/a Lower Adirondack Pride ("LAP") is a not-for-profit corporation. It has no parent corporation and no publicly held corporation owns more than 10% of its stock.

Empire Justice Center is a not-for-profit corporation. It has no parent corporation and no publicly held corporation owns more than 10% of its stock.

Justice in Aging is a nonprofit corporation. It has no parent corporation and no publicly held corporation owns more than 10% of its stock.

Lambda Legal Defense & Education Fund, Inc. is a not-for-profit corporation. It has no parent corporation and no publicly held corporation owns more than 10% of its stock.

Services and Advocacy for Gay, Lesbian, Bisexual and Transgender Elders, Inc. is a not-for-profit corporation. It has no parent corporation and no publicly held corporation owns more than 10% of its stock.

## STATEMENT OF INTEREST

Advocates for Trans Equality ("A4TE"); The Bridge (LGBTCC), Inc. d/b/a Lower Adirondack Pride ("LAP"); Empire Justice Center; Justice in Aging; Lambda Legal Defense & Education Fund, Inc. ("Lambda Legal"); Services and Advocacy for Gay, Lesbian, Bisexual and Transgender Elders, Inc. ("SAGE") (collectively, "Amici") respectfully submit this brief as amici curiae in support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Defendants' Motion").

A4TE, formerly the National Center for Transgender Equality, is a nonprofit organization seeking to end discrimination against transgender people. A4TE's work includes policy and litigation advocacy to protect the rights of transgender people, including in the context of healthcare.

Empire Justice Center is a statewide, not-for-profit public interest law firm in New York with offices in Rochester, Albany, White Plains, Yonkers, Hempstead, and Central Islip. Established in 1973, Empire Justice Center's mission is to protect and strengthen the legal rights of people in New York State who are poor, disabled, marginalized, or disenfranchised through systems change advocacy, direct representation, and policy advocacy. Empire Justice Center also provides training and technical assistance support in a wide range of substantive law areas, including civil rights, name and gender marker changes, health, government benefits, family law, and the rights of lesbian, gay, transgender, and queer ("LGBTQ+")[1] communities. Empire Justice Center has a decades long commitment to pursuing the rights of LGBTQ+ New Yorkers, including

[1] The "+" sign in LGBTQ+ recognizes the limitless sexual orientations and gender identities with which members of the community identify. *See, e.g.*, *Glossary of Terms*, Human Rights Campaign (last updated May 31, 2023), https://www.hrc.org/resources/glossary-of-terms. This brief uses the acronym "LGBTQ+" to describe the lesbian, gay, bisexual, transgender, queer, and gender expansive community. However, other acronyms may be referenced when used by cited sources.

older LGBTQ+ New Yorkers, through its LGBTQ+ Rights Project and other substantive law areas. Empire Justice Center also participated as amici in multiple LGBTQ+ rights cases, including *Matter of Brooke S.B. v. Elizabeth A.C.C.*, (28 N.Y.3d 1 (2016); *Matter of Tomeka N.H. v. Jesus R.*, 183 A.D.3d 106 (4th Dep't 2020); *Lashawn K. v Admin. for Children's Services*, 221 A.D.3d 431 (1st Dep't 2023); and *Cody VV. v Brandi VV.*, 226 A.D.3d 24 (3d Dep't 2024).

Justice in Aging, formerly the National Senior Citizens Law Center, is a national nonprofit legal advocacy organization that fights senior poverty through law. Justice in Aging advocates for affordable health care and economic security for older adults with limited resources, focusing especially on populations that have traditionally lacked legal protection, including LGBTQ+ individuals.

Lambda Legal is the nation's oldest and largest nonprofit legal organization committed to achieving full recognition of the civil rights of LGBTQ+ people and everyone living with HIV through impact litigation, education, and policy advocacy. Lambda Legal is committed to ensuring that nondiscrimination protections are properly understood and applied to comprehensively address the disparities experienced by the communities we serve in every facet and stage of life, including by LGBTQ+ older adults.

LAP is a nonprofit organization dedicated to advancing the rights, visibility, and well-being of LGBTQIA+ individuals across Warren, Washington, and northern Saratoga counties in New York's North Country. LAP works to build safer, more inclusive communities through direct support services, community programming, advocacy, and education. The organization provides free case management, mental health counseling, transportation assistance, and outreach to individuals experiencing housing insecurity, while also hosting community events and advancing policies that protect and affirm LGBTQIA+ people throughout the region.

SAGE is the country's largest and oldest organization dedicated to improving the lives of LGBTQ+ older people. Founded in New York City in 1978, SAGE provides direct services to thousands of LGBTQ+ older New Yorkers, and, with the Human Rights Campaign Foundation, administers the Long-Term Care Equality Index, which assesses long-term care facilities' policies and practices regarding LGBTQ+ residents.

A4TE, Justice in Aging, Lambda Legal, and SAGE, also co-authored the 2011 study of LGBT older adults in long-term care facilities on which the New York State Assembly relied in enacting the Lesbian, Gay, Bisexual and Transgender, and People Living with HIV Long-Term Care Facility Residents' Bill of Rights (the "Residents' Bill of Rights"). Amici share a direct interest in ensuring that LGBTQ+ older adults and people living with HIV can obtain long-term care without discrimination, and they submit this brief to provide the Court with context regarding the documented barriers those residents face and the State's legitimate interest in addressing them. Amici have filed a motion for leave to file this brief. No party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than Amici, their members, or their counsel contributed money intended to fund the preparation or submission of this brief.

## ARGUMENT

Cathy and Esther had been together for thirty-three years when Cathy was diagnosed with a rare form of leukemia.[2] As she received end-of-life care, Cathy noticed that once her nurses learned Esther was her wife, Cathy received less nursing care and attention.[3] So Cathy asked Esther to stop telling anyone they were married.[4] "[It was] really hard to hear," Esther later recounted, "It's so important they know. For being able to make decisions. It's important for Cathy, for me."[5]

The New York Legislature enacted the Residents' Bill of Rights in 2023 so that no resident of a New York long-term care facility would be forced into making the same choice as Cathy—the choice between acknowledging their marriage and receiving the care they need. Although the Residents' Bill of Rights exists to secure dignity for residents who have too often been denied it, Plaintiffs nonetheless ask this Court to invalidate the very provisions that make that guarantee real. This Court should decline the invitation to do so and grant Defendants' Motion.

*First*, doing so will preserve the much-needed safeguards the Residents' Bill of Rights affords LGBTQ+ older adults and those with HIV. These individuals (A) enter their later years in poorer health, at least in part due to discrimination throughout their lives; (B) face barriers to accessing long-term and end-of-life care; and (C) are especially at risk of discrimination, isolation, and substandard care in long-term care settings. *Second*, as the legislative record and broader research demonstrate, the Residents' Bill of Rights directly targets these barriers specific to

---

[2] Carey Candrian and Kristin G. Cloyes, *"She's Dying and I Can't Say We're Married?": End-of-Life Care for LGBT Older Adults*, 61 The Gerontologist, 1197, 1198 (2021), https://academic.oup.com/gerontologist/article/61/8/1197/6030904.

[3] *Id.*

[4] *Id.*

[5] *Id.*

LGBTQ+ older adults and those with HIV and ensures they are able to access necessary health care and age with dignity.

Amici respectfully request that the Court grant Defendants' Motion to ensure the continued protection of New York's LGBTQ+ older adults and those with HIV from discrimination.

## I. LONGSTANDING AND PERVASIVE DISCRIMINATION AGAINST LGBTQ+ OLDER ADULTS NECESSITATES THE PROTECTIONS AFFORDED BY THE RESIDENTS' BILL OF RIGHTS.

The Residents' Bill of Rights was not a solution in search of a problem. It passed with overwhelming support after the Legislature examined how LGBTQ+ older adults and people living with HIV are treated in long-term care settings. The legislative record, and the substantial body of research that confirms it, describes a community that is disproportionately dependent on long-term care and particularly exposed to discrimination within it. Based on that record, the Legislature sought to further New York's legitimate interest in addressing these issues by enacting the Residents' Bill of Rights. Accordingly, the Court should grant Defendants' Motion.

### A. A Lifetime of Discrimination Leaves LGBTQ+ Older Adults in Poor Health.

LGBTQ+ older adults enter their later years carrying the physical and mental toll of decades of discrimination. Most came of age when discrimination against their community was accepted and legally codified.[6] Although subsequent laws outlawed discrimination in numerous areas, widespread prejudice and stigma persist against this growing and aging population. In New York, over one million adults identify as LGBTQ+.[7] And 28% of LGBTQ adults in New York

---

[6] Lauren J.A. Bouton, Amanda M. Brush & Ilan H. Meyer, *LGBT Adults Aged 50 and Older in the US During the COVID-19 Pandemic*, Williams Inst. UCLA Sch. L., 9 (Jan. 2023), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Older-Adults-Jan-2023.pdf.

[7] N.Y. State Dep't of Health, *New York State Department of Health Releases Report on Sexual Orientation and Gender Identity* (July 8, 2025), https://www.health.ny.gov/press/releases/2025/2025-07-08_gender_identity_report.htm.

are over 50 years old.[8] Nationally, "nearly 3 million people aged 50 and over currently identify as LGBTQ+, a number projected to rise to around 7 million as the aging population grows."[9] A 2023 survey revealed that LGBT adults experience discrimination in their daily lives at higher rates than non-LGBT adults (65% versus 40%).[10] Nearly half of transgender adults experience discrimination in public places like stores and public transit.[11]

Discrimination against LGBTQ+ people has been extensively documented in health care settings. Researchers describe the effect as "minority stress": "sexual and gender minorities are exposed to unique stress related to stigma and prejudice," and "this stress leads to adverse health outcomes."[12] LGBT adults are twice as likely as their non-LGBT counterparts to report negative experiences in health care settings, such as being treated unfairly or disrespectfully (33% v. 15%).[13] The majority of LGBTQ older adults have also experienced some form of mistreatment due to their sexual orientation or gender identity, including in health care settings.[14] For example,

[8] SAGE, AARP N.Y. & AARP Found., *Disrupting Disparities: Solutions for LGBTQ New Yorkers 50+* 2 (2021), https://www.sageusa.org/wp-content/uploads/2025/08/disrupting-disparities-lgbtq-new-yorkers-3.pdf.

[9] SAGE, *Facts on LGBTQ+ Aging* 1 (May 2025), https://www.sageusa.org/wp-content/uploads/2025/08/sage-facts-on-lgbtq-aging-2025.pdf.

[10] Alex Montero et al., *LGBT Adults' Experiences with Discrimination and Health Care Disparities: Findings from the KFF Survey of Racism, Discrimination, and Health*, KFF (Apr. 2, 2024), https://www.kff.org/racial-equity-and-health-policy/lgbt-adults-experiences-with-discrimination-and-health-care-disparities-findings-from-the-kff-survey-of-racism-discrimination-and-health/.

[11] Caleb Smith & Haley Norris, *The LGBTQI+ Community Reported High Rates of Discrimination in 2024*, Ctr. for Am. Progress (Mar. 12, 2025).

[12] Soon Kyu Choi & Ilan H. Meyer, *LGBT Aging: A Review of Research Findings, Needs, and Policy Implications* Williams Inst. UCLA Sch. L., 11 (Aug. 2016), https://williamsinstitute.law.ucla.edu/wp-content/archive/LGBT-Aging-Aug-2016.pdf.

[13] Montero et al., *supra* note 10; *see also LGBTQ+ Survey Summary*, Stony Brook Med. https://www.stonybrookmedicine.edu/LGBTQ/2021-Survey-Summary (37% of LGBTQ residents reported a health care provider or their staff treated them disrespectfully or in a non-affirming way).

[14] Karen Fredriksen Goldsen, *Shifting Social Context in the Lives of LGBTQ Older Adults*, 82 Pub. Pol. & Aging Rep. (2018), https://pmc.ncbi.nlm.nih.gov/articles/PMC5972452/ (finding that over "two-thirds of LGBTQ older adults experienced victimization and discrimination more than three times in their life," including in aging and health services settings).

in one study, a "respondent shared his experience of witnessing nurse aids provide sub-quality care to an older gay patient because of their homophobia."[15]

Transgender adults face additional hurdles. The 2022 USTS Health and Wellbeing Report collected responses from over 84,000 transgender adults; half reported a negative experience involving a health care provider and "24% avoided care due to fear of mistreatment."[16] According to a study of transgender adults living in New York City, 74% had avoided or delayed health care.[17] Of those who had avoided or delayed care, nearly half felt providers were not transgender sensitive, 65% were concerned that providers would not be knowledgeable about their health care needs, and 68% had past negative experiences with health care.[18] These concerns are well-founded.

For many LGBTQ+ older adults, the barriers to long-term care are rooted in their painful history with access to medical care. LGBTQ+ older adults who lived through the HIV/AIDS epidemic are all too familiar with the trauma associated with being ostracized from the health care system and the distrust that ostracization fosters.[19] During that time, an HIV/AIDS diagnosis was essentially a death sentence.[20] "[P]olitical, media, and religious discourses intersected to construct gay men as responsible and deserving of infection and were, in turn, weaponized to substantiate

---

15 Choi & Meyer, *supra* note 12, at 7 (citing Loree Cook-Daniels & michael munson, *Sexual Violence, Elder Abuse, and Sexuality of Transgender Adults, Age 50+: Results of Three Surveys*, 6 J. LGBT Fam. Studies 147–77 (2010)).

16 *Health & Healthcare*, Advoc. for Trans Equal., https://transequality.org/issues/health-healthcare (last visited Oct. 20, 2026).

17 Lauren M. Porsch, Ila Dayananda & Gillian Dean, *An Exploratory Study of Transgender New Yorkers' Use of Sexual Health Services and Interest in Receiving Services at Planned Parenthood of New York City*, 1 Transgender Health 231, 233 (2016), https://pmc.ncbi.nlm.nih.gov/articles/PMC5367479/.

18 *Id.*

19 Ben R. Inventor, Olimpia Paun & Erik McIntosh, *Mental Health of LGBTQ Older Adults*, 60 J. Psychosocial Nursing & Mental Health Servs. 7, 8 (2022), https://pubmed.ncbi.nlm.nih.gov/35353662/; *see* Ingrid Handlovsky et al., *The Collective Trauma of HIV/AIDS and Contemporary Constructions of Health: Older Gay Men's Perspectives*, 6 SSM - Qualitative Rsch. Health (2024), https://www.sciencedirect.com/science/article/pii/S2667321524000866#bib46.

20 *See* Ingrid Handlovsky et al., *The Collective Trauma of HIV/AIDS and Contemporary Constructions of Health: Older Gay Men's Perspective*, 6 SSM - Qualitative Rsch. Health (2024), https://www.sciencedirect.com/science/article/pii/S2667321524000866#bib46.

the absence of any organized public health response."[21] As one 71-year-old living with HIV recalled, "[d]ozens of people were dying every day . . . . Your life becomes going to support groups, going to visit friends in the hospital, going to funerals."[22] These are the experiences LGBTQ+ older adults carry with them as they age and consider long-term care.

HIV is not just a problem of the past. Older adults continue to be diagnosed with HIV, and gay and bisexual men account for 67% of diagnoses among people aged 50 and older.[23] Compared to younger people, older adults with HIV are more likely to face medical complications and social isolation.[24] As this population ages, more LGBTQ+ older adults living with HIV will need care in long-term institutional settings.

Ongoing experiences with discrimination also exacerbate mental health challenges.[25] Twenty-nine percent of LGBTQ+ adults reported poor or bad mental health, compared to 10% of non-LGBTQ+ adults.[26] In particular, transgender adults face severe mental health disparities: in a 2024 national survey, 74% of transgender adults reported that discrimination had affected their mental well-being, with 54% of them rating their mental health as poor or bad.[27] In a 2023 survey, 43% of transgender adults had experienced suicidal thoughts in the preceding year.[28] In a survey of LGBTQ+ adults on Long Island, over 60% reported symptoms of chronic depression, over a

---

21 *Id.*

22 Judith Graham, *LGBTQ+ People Relive Old Traumas as They Age on Their Own*, The Lund Report (Jan. 2, 2025), https://www.thelundreport.org/content/lgbtq-people-relive-old-traumas-they-age-their-own; *see also* Rory Herbert, *The Homophobic Response to the AIDS Crisis in the 1980s*, The Gale Review (May 17, 2017), https://review.gale.com/2017/05/17/the-homophobic-aids-crisis-of-the-1980s/ (discussing homophobic news coverage from the 1980's of the HIV/AIDS crisis).

23 SAGE & Movement Advancement Project, *Understanding Issues Facing LGBT Older Adults* 22 (2017), https://www.sageusa.org/wp-content/uploads/2025/08/sageusa-understanding-issues-facing-lgbt-older-adults.pdf.

24 *Id.*

25 Montero et al., *supra* note 10.

26 Smith & Norris, *supra* note 11.

27 *Id.*

28 Lindsey Dawson et al., *LGBTQ+ Health Policy*, KFF (Oct. 8, 2025), https://www.kff.org/lgbtq/health-policy-101-lgbtq-health-policy/.

third reported moderate to severe anxiety and depression, and nearly 17% engaged in self-harm.[29] As LGBT adults age, "exposure to multiple, negative, stressful experiences over the life course," increases risk for conditions like depression.[30] In one study, 31% of older LGBT individuals had depression, which is two to three times the estimated prevalence among all older Americans.[31]

Outright discrimination, fear of engaging with the health care system, and lack of competent health care manifest in significant health disparities. LGBT people are more likely to experience certain chronic conditions such as "asthma, arthritis, diabetes, kidney disease, hypertension, cardiovascular disease, heart attack, stroke, and chronic obstructive pulmonary disease" than non-LGBT individuals.[32] Consequently, they enter their later years in poorer health than their non-LGBTQ+ peers.[33]

### B. LGBTQ+ Older Adults Depend Disproportionately on Formal Long-Term Care.

LGBTQ+ older adults, like most people, need long-term care and assistance with activities like toileting, bathing, and dressing as they age.[34] Unlike their non-LGBTQ+ peers, however, they face barriers to accessing care and have fewer alternatives. About half of LGBTQ+ older adults report having a disability, and 44% feel physically limited due to a physical, mental, or emotional

---

29 *LGBTQ+ Survey Summary*, Stony Brook Med. https://www.stonybrookmedicine.edu/LGBTQ/2021-Survey-Summary (last visited Oct. 27, 2026).

30 Brandon C. Yarns et al., *The Mental Health of Older LGBT Adults*, 18 Current Psychiatry Reports 1, 17 (2016), https://pubmed.ncbi.nlm.nih.gov/27142205/.

31 *Id.*

32 Dawson et al., *supra* note 30.

33 The compounding effects of a lifetime of discrimination also leave many LGBTQ+ older adults economically disadvantaged: nearly one-third of LGBT older adults live at or below 200% of the federal poverty level. SAGE & Movement Advancement Project, *Understanding Issues Facing LGBTQ+ Older Adults* 10 (2025), https://www.sageusa.org/wp-content/uploads/2025/08/sageusa-understanding-issues-facing-lgbt-older-adults.pdf; Justice in Aging, *Supporting LGBTQ+ Older Adults' Basic Needs* (Sept. 18, 2025), https://justiceinaging.org/supporting-lgbtq-older-adults-basic-needs/.

34 Jennifer L. Carnahan & Andrew C. Pickett, *Post-Acute Care and Long-Term Care for LGBTQ+ Older Adults*, 40 Clinical Geriatric Med. 321, 323 (2024).

condition.[35] Older adults who are transgender or have HIV face an even higher risk of certain disabilities, physical disabilities, and mental health conditions.[36]

LGBTQ+ older adults have fewer options for informal care than their non-LGBTQ+ counterparts. Unlike heterosexual older adults who are more likely to have spouses or children to provide care, LGBTQ+ older adults are twice as likely to live alone and not have children, and five times less likely to be married.[37] Moreover, some LBGTQ+ older adults may be estranged or conceal their sexual orientation from family due to their family's lack of acceptance.[38] As such, many LGBTQ+ older adults lack the intergenerational levels of support that their peers have.[39]

While many LGBTQ+ older adults turn to "families of choice" (*i.e.*, families composed of close friends) or affirming community or religious groups for long-term care, researchers contend that "social expectation for long-term care and support that exists for biological kin do not exist within friends," making such care less reliable for LGBTQ+ older adults.[40] Other limitations include reduced caregiving by aging families of choice due to their own health challenges and fewer opportunities to form new families of choice as LGBTQ+ older adults age.[41] Informal, unpaid caregiving is also financially burdensome for caregivers.[42] Consequently, many LGBTQ+ older adults rely on paid long-term care, including nursing facilities.[43]

---

35 Choi & Meyer, *supra* note 12, at 26.
36 *Id.* at 1.
37 SAGE, *supra* note 9.
38 Choi & Meyer, *supra* note 12, at 8.
39 *Id.* (citation omitted).
40 *Id.*; *see also* AARP, *Maintaining Dignity: Understanding and Responding to the Challenges Facing Older LGBT Americans* 23 (2020), https://www.aarp.org/content/dam/aarp/research/surveys_statistics/life-leisure/2020/maintaining-dignity-lgbt-reformatted.doi.10.26419-2Fres.00217.006.pdf (reporting that 75% of LGBT people age 45+ are concerned about having enough support from friends and family as they age).
41 Choi & Meyer, *supra* note 12, at 19.
42 *See* TIAA Institute, *Playing the Long Game: How Longevity Affects Financial Planning and Family Caregiving* 5 (2023), https://www.tiaa.org/content/dam/tiaa/institute/pdf/insights-report/2023-10/tiaa-institute-upenn-how-longevity-affects-financial-planning-ti-november-2023.pdf.
43 Justice in Aging, *Stories from the Field: LGBT Older Adults in Long Term Care Facilities* (2024) https://lgbtagingcenter.org/wp-content/uploads/sites/6/2025/08/NSCLC_LGBT_report.pdf; Medicaid provides free or low-cost health coverage to individuals with limited income and resources. In 2024,

### C. In Long-Term Care Settings, LGBTQ+ Residents Often Face Discrimination and Neglect.

For many LGBTQ+ older adults, entering a long-term care facility forces them to choose between hiding who they are or risking care.[44] Concerns about discrimination, harassment, isolation, and denial of essential care in nursing and assisted living facilities are prevalent among LGBTQ+ older adults, and for good reason.[45] In a 2020 study, about half of lesbian, gay, and bisexual older adults worried about hiding their identity in long-term care settings, and this number rose to 70% for transgender and gender expansive older adults.[46]

The stakes are especially high at the end of life. When facility staff refuse to include a patient's chosen family in decisions, require patients to hide their identity, or force them to make burial arrangements under a name and gender inconsistent with their identity, they inflict harm at the moment patients are least able to resist.[47] These harms are unfortunately all too common. In a survey of 769 older adults in end-of-life care, loved ones, and providers, 43% of respondents reported witnessing some form of mistreatment based on sexual orientation or gender identity.[48]

---

Medicaid is the primary payor for over 60% of nursing facility residents. Priya Chidambaram et al., 5 *Key Facts About Nursing Facilities and Medicaid*, KFF (May 28, 2025), https://www.kff.org/medicaid/5-key-facts-about-nursing-facilities-and-medicaid/.

44 Justice in Aging, *Stories from the Field: LGBT Older Adults in Long Term Care Facilities* (2015), https://www.justiceinaging.org/wp-content/uploads/2011/04/RE_LGBT-Stories-from-the-Field.pdf; Sara Luterman, *LGBTQ+ Seniors Fear Having to Go Back in Closet for the Care They Need*, Them (Oct. 12, 2021), https://www.them.us/story/lgbtq-seniors-fear-having-to-go-back-in-closet-for-the-care-they-need (reporting that one-third of LGBTQ+ seniors in New York worry about re-closeting in order to gain access to housing or long-term care).

45 AARP, *Maintaining Dignity: Understanding and Responding to the Challenges Facing Older LGBT Americans* 26, 46 (2020), https://www.aarp.org/content/dam/aarp/research/surveys_statistics/life-leisure/2020/maintaining-dignity-lgbt-reformatted.doi.10.26419-2Fres.00217.006.pdf.

46 *Id.* 6 at 46.

47 Kevin A. McLemore, *A Minority Stress Perspective on Transgender Individuals' Experiences with Misgendering*, 3 Stigma & Health 53, 59 (2016); *see* Kevin A. McLemore*, Experiences with Misgendering: Identity Misclassification of Transgender Spectrum Individuals*, 14 Self & Identity 51, 60 (2014); Maingi et al., *Improving the Hospice and Palliative Care Experiences of LGBTQ Patients and Their Caregivers,* 48 Primary Care: Clinics Off. Prac., 339, 341-342 (2021), https://www.sciencedirect.com/science/article/abs/pii/S0095454321000142?via%3Dihub.

48 Justice in Aging, *Stories from the Field: LGBT Older Adults in Long Term Care Facilities* (2024) https://lgbtagingcenter.org/wp-content/uploads/sites/6/2025/08/NSCLC_LGBT_report.pdf; *see also* Maingi et al., *Improving the Hospice and Palliative Care Experiences of LGBTQ Patients and Their Caregivers*, 48 Primary Care: Clinics Off. Prac., 339, 340 (2021),

Of these instances, LGBTQ+ older adults were refused admission or abruptly discharged from their long-term care facilities because of perceived sexual or gender orientation over 150 times.[49] The potential for retaliation for reporting mistreatment is not hypothetical. For example, one transgender man who suffered sexual and verbal abuse at the hands of his nurses in a long-term care facility refused to report it when encouraged to do so by his social worker "out of fear of retaliation from the nurse aids and disclosure of his transgender status to his family."[50]

This kind of discrimination and fear cuts LGBTQ+ older adults off from the relationships and communities that sustain them. Because long-term care facility residents depend on the staff for their daily care, the fear of mistreatment pressures many to hide who they are, and concealment results in isolation.[51] Discriminatory generalizations can further isolate residents. For example, staff who assume LGBTQ+ identity is incompatible with religion may exclude LGBTQ+ residents from spiritual life, even though spirituality remains very important for many LGBTQ+ older adults, some of whom are active members of religious communities and even former clergy.[52]

Laws like the Residents' Bill of Rights combat the significant health disparities LGBTQ+ adults face in long-term care. These protections allow LGBTQ+ older adults to enter their final years with the comfort, dignity, and support that have been historically out of reach.

---

https://www.sciencedirect.com/science/article/abs/pii/S0095454321000142?via%3Dihub (noting one-quarter of hospice professionals had witnessed overt discrimination against LGBTQ+ patients and their loved ones).

49 Justice in Aging, *Stories from the Field: LGBT Older Adults in Long Term Care Facilities* (2024) https://lgbtagingcenter.org/wp-content/uploads/sites/6/2025/08/NSCLC_LGBT_report.pdf.

50 Choi & Meyer, *supra* note 12, at 14.

51 *See id.* at 16.

52 Maingi et al., *Improving the Hospice and Palliative Care Experiences of LGBTQ Patients and Their Caregivers,* 48 Primary Care: Clinics Off. Prac., 339, 343 (2021), https://www.sciencedirect.com/science/article/abs/pii/S0095454321000142?via%3Dihub.; Anna Gordon, *LGBTQ Seniors Face Discrimination in Long-Term Care,* PBS News Hour (Oct 18, 2016), https://www.pbs.org/newshour/nation/lgbtq-seniors-face-discrimination-long-term-care.

## II. NEW YORK'S RESIDENTS' BILL OF RIGHTS ADDRESSES THE BARRIERS FACED BY LGBTQ+ OLDER ADULTS AND THOSE WITH HIV IN ACCESSING LONG-TERM CARE.

Without appropriate legal protections, like the ones Plaintiffs seek to invalidate here, long-term care facilities are less likely to proactively implement LGBTQ+ friendly policies.[53] Before the Residents' Bill of Rights' statewide protections were put in place on November 30, 2023, few long-term care facilities had adopted policies to protect residents from discrimination based on sexual orientation or gender identity.[54] The Legislature's rationale for the Residents' Bill of Rights was grounded in a 2011 study based on a survey of "hundreds of LGBT seniors, family members, friends, social service providers, legal service providers and others" that found:

> 78% of LGBT seniors felt that they could not be open with the staff of a long-term care facility about their sexual orientation or gender identity, and a majority of all respondents identified discrimination by staff (89%), discrimination by other residents (81%), isolation from other residents (77%), and abuse or neglect by staff (53%) as issues that LGBT seniors face in long-term care facilities.[55]

By addressing the specific forms of discrimination identified in the study, the Residents' Bill of Rights sought to buttress New York's existing anti-discrimination protections.[56] The Residents' Bill of Rights ensures that LGBTQ+ older adults and those with HIV can live openly and with dignity in long-term care settings. For example, a facility may not: deny admission based on LGBTQ+ status, transfer or refuse to transfer a LGBTQ+ resident, or discharge or evict a LGBTQ+ resident based on status. The law also protects residents from discrimination and

---

53 *See* SAGE & Human Rights Campaign, *Long-Term Care Equality Index 2021*, 6 (2025), https://www.sageusa.org/wp-content/uploads/2025/08/sage-lei-2021-report-final.pdf.

54 *See* N.Y. Pub. Health Law § 2803-c-2 (McKinney 2026); Act of Nov. 30, 2023, ch. 682, 2023 N.Y. Laws 1874; SAGE & Human Rights Campaign, *supra* note 54, at 6.

55 N.Y. State Assemb., Memorandum in Support of Legis., A. 372A, 246th Leg., Reg. Sess. (2023).

56 *Id.*

harassment in housing assignments, use of facilities, associations and relationships, access to appropriate medical and non-medical care, and pronoun use.[57]

The Residents' Bill of Rights also contains safeguards intended to make these substantive protections meaningful in practice. Facilities must establish procedures concerning residents' gender identity, preferred names, and preferred pronouns. They must protect personally identifiable information concerning sexual orientation, transgender status and transition history, and HIV status from unauthorized disclosure and protect residents' privacy during physical examinations and personal care.[58] The statute additionally requires cultural competency training concerning residents who are LGBTQ+ or have HIV.[59] Together, these provisions operate to ensure these residents can obtain care while maintaining their privacy, dignity, and equal status.

The Residents' Bill of Rights responded to the barriers confronting LGBTQ+ older adults and those with HIV in long-term care settings. New York identified the circumstances under which discrimination arises in long-term care settings and supplied protections that further its legitimate interest in safeguarding residents' health under those circumstances.[60]

## CONCLUSION

The Residents' Bill of Rights is essential to ensuring that all New Yorkers, including LGBTQ+ older adults and those with HIV, receive quality, affirming health care in long-term care settings. These safeguards are critical to ensuring that residents do not need to choose between receiving necessary long-term care and being treated with human dignity.

For the foregoing reasons, and those set forth in Defendants' memorandum of law, Amici respectfully request that the Court grant Defendants' Motion.

---

57 Defs.' Mot. at 4–6.

58 *See id.* § 2803-c-2(4)–(6).

59 *Id.* § 2803-c-2(7).

60 *See* N.Y. Pub. Health Law § 2803-c-2(2)–(7) (McKinney 2026).

Dated: New York, New York
November 5, 2026

Respectfully submitted,

**FRESHFIELDS US LLP**

*/s/ Alexandra J. Carlton*

Robert J. McCallum
Alexandra J. Carlton
Monica M. Davis (motion for *pro hac vice* pending)

3 World Trade Center
175 Greenwich Street, 51st Floor
New York, New York 10007
212-277-4000
rob.mccallum@freshfields.com
alexandra.carlton@freshfields.com
monica.davis@freshfields.com

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

I, Alexandra J. Carlton, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules") and Rule 3(B) of Judge Román's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Brief of Amici Curiae in Support of Defendants' Motion to Dismiss Plaintiffs' Verified First Amended Complaint was prepared using Microsoft Word and contains 4,388 words in accordance with the Local Rules, and 14 pages in accordance with the Individual Rules. In making these calculations, I have relied on the word and page counts of the word processing program used to prepare this document.

Dated: New York, New York
November 5, 2026

*/s/ Alexandra Carlton*
Alexandra J. Carlton